Reyes v. Netdeposit Good morning, Your Honor. Reyes, how are you? Fine, thank you. Howard Langer for the plaintiff, Mr. Reyes, and the punitive class. I have ceded two minutes to counsel for the amici, and I'd like to reserve three minutes for myself. Okay. And Mr. Beck is representing all of the amici? It's a tall order. Your Honor, only the amici. Okay, okay. I thought you were representing the senators and the counsel. Their counsel is present, but they've elected to leave me some time. Your Honor, I want to proceed directly to the question that Your Honor has posed in your letter from Ms. Waldron a couple of weeks ago. This case involves an issue that this court has never faced before, which is mass market fraud, that is, entities that exist as criminal enterprises using boiler rooms and abuse of the Internet simply to steal money from people. Is that an issue so much as simply a set of facts? Well, let me give you just a set of facts, but it goes to the inferences that a court can make. Several pages of the defendant's brief is devoted to the fact that you'd have to make an individual inquiry to each person that had their account tapped. Well, that's the district court's determination that predominance has not been demonstrated under B3, right? The district court made that, but as Your Honor knows, we believe it made it erroneously for fundamental reasons. But just take as an example NHS. In the underlying case, the Federal Trade Commission established that 99.98% of the 20,000 people whose accounts were debited $300 initially and $20 a month thereafter never even attempted to use the card. I think a court could follow the inferences that it discusses in the Marcus case and assume that all of those people were defrauded because of the nature of the enterprise. Because they never used the card. What evidence, if we went downstairs, sat by designation, called the jury, how would you prove that in front of the jury? I would do two things. First, I have what they did, okay? And who's the we were talking, who's the they? You're talking about NHS? We'll take NHS, but the experts looked at each one and were able to aggregate them because they're very similar frauds. We have the expert who is the chairman of the marketing department of the Wharton School who said that he looked at everyone and, quote, nobody who was aware of what the terms were would have purchased any of these things. Some of them were the equivalent of paying money to use your own money, okay? But that's so the experts, so the jury's going to have to, would have to be told. Second, the experts are going to show what it was. That is, I'm selling you, in the case of NHS, a card that was free, that was intended to be given away free. It was like taking a coupon out of a newspaper on Sunday and selling it to people, but they weren't really selling it, debiting people's accounts for $300 and then $20 a month for that free card. So the way your proof would go is, with respect to NHS, there wouldn't be, and I'm putting aside who Mr. Reyes dealt with. Assume it was one of the tall marks he didn't deal with. It was NHS. Assume it was a different tall marker. We don't have an identified person who dealt with that, as far as I could tell from the record. These companies I think you've represented are defunct or put out of business or something along those lines. How would this proof come in simply by the experts? Wouldn't the experts have to have some factual material? The experts, well, absolutely. And the jury would have to hear it. And that's one of the things I thought the district court was struggling with is, what is this proof other than the return rates? Plenty, Your Honor. First of all, we have the records in all of these underlying proceedings, and we have more than the records in most of them. We have all the documents the government entities obtained. All right. So, Mr. Linder, I'm at a loss to understand why you are arguing the facts to such an extent. When we're here under 23F on your appeal from denial of certification, it's clear these days that peroxide is the poll star. Absolutely. With respect to what a district judge is required to do for purposes of certification and for assistance to us in review of certification or the denial thereof, what do we know from the district court opinion about what the district court thought about or did with respect to all of the experts? Okay, this is what we know. We know that the district court never mentions any of the experts and misidentifies two witnesses as plaintiff's experts. They didn't actually specifically discuss the evidence submitted with respect to either plaintiff or defendant's designated experts. Right. And realize these are not paid professional experts we presented. We presented Professor Meyer, the Chairman of the Marketing Department, immediate past Chairman of the Wharton School, Professor Boss and permanent members. There's no dispute about the quality of the expertise. And their opinions were directly contrary to what the district court found. And you raised this at your argument in front of the district court. You talked about your experts, correct? To a degree, correct. And so we know the district court was aware of them. You raised them in your argument. In Marcus, this court has found that a district court need not specifically discuss the experts. So why is this discussion in Reyes erroneous where Marcus was okay? Well, Marcus, first of all, did have discussion of the experts. And it was able to cite the Court of Appeals decision repeatedly cites to the experts. But the Court of Appeals also said the district court should have been more fulsome in its discussion of the experts. Exactly. And then continued by saying we're not going to require district courts to do this. Well, I don't really think it went that far, Your Honor, with all due respect. I think particularly hydrogen peroxide and Marcus said it was very important for the courts to address it. Well, peroxide actually has specifically said that in its sound discretion, a district court may find it unnecessary to consider certain expert opinion with respect to the certification requirement. But that leaves us somewhere in between can you ignore or can you fail to discuss all of the expert testimony or is it appropriate to only discuss that which you consider most important? But the expert testimony went to the central issue that the court decided. Well, in answering that, the focus also and then the court's misidentification of the genius, I think it's pronounced, and Milder. How does that factor into our review of whether or not the district court followed the peroxide most effectively? Well, I think it tells you, look, rigorous analysis, I believe, means rigorous analysis. Most of the time, I have to face it from the other side. And rigorous analysis goes all the way back to Falcone. There's nothing new about that. Correct, but it certainly was stressed in hydrogen peroxide and it was applied particularly with regard to experts. In this case, the district court told us what he relied on. The only citation to record evidence were the two people he cited as our experts  because they said that these return rates were red flags. The court said, well, that's not absolute proof, which is the second error that we obviously raised with you. But Falcone says that that absolute proof was not meant to define the quantity of proof the district court was inquiring, but it was just a statement that, well, that's not absolute proof in order to show that that evidence factored in does not get you over the wall. No, that informed the entire court's analysis  The district court wanted to see if there was something it could just cite in which it could apply across the board as though it were pushing a button and discovering this was fraud, and it looked for absolute proof. And it said, I'm looking at the return rates alone, which was not the predominant. Certainly, it's a very important issue. The Federal Reserve said that rates like this were prima facie proof. Actually, rates way below this were prima facie proof of both fraud and advanced knowledge. But that's not ponderance of the evidence, which is the standard you need to meet. No, but the way it would work is that once one makes a prima facie case, something has to come back. And there was nothing presented to explain the level of these rates except for one of the frauds who took the stand. Do you think there's a proof shifting like McDonnell Douglas in this scenario? I understood that the party seeking class certification carried the burden of proof on each of the elements by preponderance of the others. Correct. And what we were showing was that there was, in terms of return rates, that there was an objective that the court could look to in addition to the expert testimony and actually descriptions of what each of these frauds were. And there were only five or six frauds altogether who, you know, prior arguments said there were 30 defendants. This case, compared to, say, the liner board case that I had in front of Judge McKee many years ago, was not a complex case because the frauds were so basic. I mean, selling something that was free for $300. The whole way of looking at it that way is, in a sense, a mistake because the goal was not to sell anybody anything. It was simply to get their account numbers. They couldn't possibly have generated return rates like those in this case by calling all the people and having things bounce. It would mean that everybody gave them, you know, in one case 85% of the people they allegedly got approval from gave them the wrong account number when they called them. It was more in efforts, to the extent anyone was called, it was to get their bank account number in order to tap their account. But 99.98% of the people didn't even try to use it. I think it's strange. I could show you. I've got a desk drawer full of cards at home that I have never ever used. One day I'll go around shredding them, but they're just sitting there. So the fact that they weren't used. But if you paid $300 for one of those cards, Your Honor, you would have tried to use it. Or I would have sent it back. Correct. That didn't happen here. But I want to point, Your Honors, out to one case that I think deals with the issue that you put to us in your letter but which I don't think was sufficiently stressed, which is Marcus v. BMW, because that case deals with the situation we're in now. Marcus is an ascertainability case. What does that have to do with this matter? Because at the end of Marcus, the court remanded, and the court remanded because the court – let me just focus the language, okay? It said that there were circumstances, as we described in our brief, where the court could assume that nobody would have purchased the item. It says as follows. We involved – it discusses two New Jersey Supreme Court cases, one of which involved a kind of fortifying drink that didn't have the things in it that they said that would fortify it, and one which was really the remand situation in Life U.S.A., an insurance product that was sold but which didn't reveal that its dividends would not, in fact, match the premiums. And the court said the following. It's distinguishing Life U.S.A. – excuse me, distinguishing Marcus. We involved, quote, a worthless product for which all representations were baseless. There was no reason for the Lee court to believe that a significant number of class members would, despite knowing that the product was worthless, purchase it anyway. Similarly, Vaccarello, it was inconceivable that more than a very small number of plaintiffs would purchase a vanishing premium insurance policy, despite knowing that the promised dividend rates were inflated. Okay, and in this case, the evidence is much stronger than in those cases because the products were essentially worthless. When you hear about this, quote, AIG insurance product, there was no website that sold that product. People who went to a payday loan website and put in their account number suddenly found themselves getting charged for this identity theft insurance that was worth virtually nothing to them, since if you were at the payday loan website in the first place, you were destitute. I'm having a hard time figuring out how your argument relates to the denial of certification. It sounds to me like you're arguing the merits of the claims. Let me go back and address that quickly because your light's been hard for a while. Okay, I'm sorry. The district court, in applying the two statements that it made, first, that plaintiff had not produced absolute proof and that the court could not have any doubt as to whether... But we all know absolute proof is not required here. Right, but that's what... And the district court couldn't have... Well, it did, and I'll tell you why. Because that's how its analysis went. What the court did was when it had the... It looked for absolute proof so that it would not have any doubt. Okay, and the only thing it cites... Once it felt that it had the any doubt standard, it looked for something in the record that would be the type that might create doubt in a juror's mind. And the doubt it cited, and it only makes one citation to the record, is to this telemarketer who took the stand and said that his wife had used the product. First, the health care benefit in the product. First, when you look at the particular thing he was selling, it wasn't a health care card in the first place. His wife didn't spend $150 on it. But what the court was doing was it was looking, because of its erroneous view of what it had to find, whether there was any doubt. And because it used that standard instead of a preponderance of the evidence standard, it didn't look at the experts who said, I looked at that product, and it was a complete fraud that nobody would have ever purchased. That's what the contrary evidence was. And then there was what it was itself, a credit card, a debit card for which you were charged $150 as a sign-up fee and $20 a month. And then charged each time you used it on top of that to use your own money. Well, part of what they're saying in response to that is that you had the opportunity to and did not call any individuals from any of these entities to establish that the entities other than Zion Bank were a total fraud. Now, clearly there are strategic reasons why you may not want to put one of those folks on the stand. But that's what they're arguing, and therefore you didn't show the complete sham. I think that's what they're arguing. But that's an issue for trial. I showed more than enough evidence that would have presented the court with sufficient evidence for a jury to conclude that these were complete shams. I presented what they did. I presented experts from three different angles who described what they did. I presented return rates that were at the lowest three times what the Federal Reserve said would be a prima facie case with no explanation contrary as to why they would have had these return rates. And I presented because the bank's own documents that show that the bank believed that several of these entities were frauds. And, you know, that's a pretty strong case to put on. A jury could certainly conclude that they were complete frauds based on that. Because we're not focusing, if I sell you for $300 something that's for free, we're not focusing on what you did. We're focusing on what was going on, what was sold, so to speak. I say sold, I say debited because I believe many people weren't even contacted and just had their accounts tapped. But we're not focusing on what this or that class member actually did or thought about. In the case of NHS, it was 99.98% of the people not using it. What difference would it make what was said? Mr. Reyes was told he was going to get a government grant. In our complaint we say other people were told they were being called by the Social Security Administration. Another person was told it was the Army calling him to follow up on his pension. But some of your allegations go to people who had no contact with the telemarketers at all and their identification information was procured. Of course. And so isn't that a different proof? I think it goes back to what Judge Smith is saying is we're focused on predominance of commonality of the ability to prove through, I think some of the cases say through one stroke, not a push of the button, but through one stroke, so that it's an appropriate means of using the cost certification tool. Let me respond to that directly. The language you're quoting is actually from the common questions issue discussed in Duke's. And by one stroke they mean that there is, and this is particularly discussed in the opinion we sent to you by Judge Wood a couple of weeks ago, what they mean is that one aspect of the case will be resolved for all people. And if we show that the bank was operating with the subsidiary as a RICO enterprise, which is our allegation, we will resolve in one stroke a major element of every person's claim. And the more of these entities that we show were in fact these frauds, the stronger will be the evidence for every person who was defrauded because the argument that this is something that slipped through the cracks or something will go away. The fact that we're able to show that the bank acknowledged they were keeping these customers because it was the only thing that kept the subsidiary profitable, which is explicitly said, is strong evidence that goes to everybody. And once we establish the common question of the RICO enterprise, we have in one stroke resolved a major element in everybody's case by doing that. And that's what is meant by the one stroke. Thank you. Your time, but I do want to make sure we have time for Mr. Becker, and I want to make sure that I don't have to cut your colleagues' time on the other side of the table off too short either. They deserve the same kind of red light time that you got. Thank you, Your Honor. Mr. Becker, how are you? I'm well. Great. Chief Judge McKay, may it please the Court, I'm Chip Becker here for the Amici Community Legal Services and the Public Interest Law Center of Philadelphia. And my goal here today is mainly to emphasize, first to emphasize, of course, Judge Smith, as you mentioned earlier, that hydrogen peroxide really is the pole star for class certification analysis in this circuit and, of course, now one of the leading cases nationwide. And we think that the district court ran afoul of hydrogen peroxide in a number of respects, but most importantly in the district court's failure to acknowledge and to deal carefully with the expert testimony that was proffered by the plaintiff. And the further point that I would want to make is that if this court ratifies the approach that the district court used, that you will be undermining hydrogen peroxide, we believe, and you will be sending a message that we think will make it more difficult for class actions to be certified in all kinds of cases, certainly the kinds of cases that CLS and Pell Cop involve themselves in, special education, disabilities rights, benefits issues, but all kinds of cases where the case really could be tried on the basis of common evidence, but the case doesn't get that far because the district court doesn't pay appropriate attention and perform the kind of rigorous analysis that is necessary under hydrogen peroxide. So from your point of view, if the district court had simply added a line, and I am more persuaded by Zion's experts, that wouldn't have been enough? Well, Judge, I think that words matter. And Judge Smith said earlier that, well, the district court probably didn't mean what he said when he used the phrase absolute proof. But there it is. That's the phrase. And so I think how an opinion presents itself, what is on the face of the opinion and the substance of the opinion does matter and does send a message about what hydrogen peroxide means and how it is to be enforced by this court. And so we urge you, for the purpose of this case but more broadly, to reverse, remand, and require the district court to conduct the kind of comprehensive analysis that hydrogen peroxide requires, not just, again, for the sake of this case, but to hold a line and to enforce the meaning of hydrogen peroxide for the sake of all kinds of other cases where, as a practical matter, we realize that if the class action device is not available, there is no remedy for the right that is sought to be vindicated. Okay. Thank you. Thank you, Mr. Becker. Mr. Snyderman. Thank you, Your Honor. May it please the court, Jason Snyderman from Blank Run. Can I go down just a little bit more? Certainly. Thanks. I thought I was okay with Mr. Becker going before me. He's a little bit taller than you are. I don't want to say that, but you forced me. That's quite all right. Is that better, Your Honor? That's fine. Thanks. May it please the court, Jason Snyderman from Blank Rome, on behalf of the Zions Defendant's Appellees in this matter. Mr. Snyderman, how is it rigorous analysis to virtually ignore the evidence presented of both parties' experts in the discussion section of an opinion dealing with certification? And to misidentify two experts. That's pretty astounding to me. I'll take both questions in turn. I'll take yours first, Chief Judge. There is no dispute that the court made an error when it referred to the two witnesses as plaintiff's experts. It was a harmless error. In fact, throughout the plaintiff's briefing in the case, and both at the trial court level and on appeal, the plaintiff kept referring to Mr. Geisser as an expert. That's a really easy one for you to answer, isn't it? That's what I thought. Because the district court did discuss it. He just misdesignated the people. Right. But he did not discuss, I mean, beyond the introductory recitation that he had considered this, we don't know in what manner it was. Where were they? Right. Well, Judge Smith, there is no discussion of the experts. I think it's important to note, as I believe you said with Mr. Langer, there was no discussion of any experts in this case. So let's start from whether or not the court was required to have such a discussion. Hydrogen peroxide. Well, there wasn't. I think we can all agree it wasn't required to have a discussion, per se, by name, between Boss and Blake and Mayer. But there has to be something on the surface of the opinion to let us know that what the court did was the rigorous analysis that we required under hydrogen peroxide. And the other thing that concerns me is what the court did with the, I keep going at a discount rate, but the refusal rate or the rejection rate, the bounce-back rate. And it seemed that the court was saying, well, you know, there are high rates, and everyone would concede, even you would concede that there are high rates. But in your brief, you argue, well, there are a lot of different reasons that would explain why there might be high rates. And you make the same argument about the coding, that there are 83, I think, different codes. So the fact that there are some erroneous codes doesn't really matter. But statistically, and I'm certainly not an expert on statistics, whatever errors are there, it would seem to me, would be randomly sprinkled across the universe of telemarketers. So the fact that there may be erroneous coding, which I think everybody would agree to, is there. But whatever rate of erroneous coding is going to be there, it seemed to me, would be there for Visa or Discover or MasterCard or Net Deposit or all you other folks. And you see a blip on the screen where everybody else is moving along at a 1.2 or a 1.3 or a 2% rejection rate, and then you see somebody is at 88.5 or whatever. That suggests to me you've got something other than random miscoding or random mistakes going on that's significant. Clearly the people at the bank thought something was going on here internally, because of all these memos that the court didn't really mention either. What do we do with all that? Again, there's multiple questions here. I'd like to take them internally. I don't want to neglect Judge Smith's question about the experts generally. We could go back to the last argument and ask why are we here, but I prefer not to do that. And I'm happy to answer all of these questions. I just want to make sure I get to each one. So Judge Smith asked why can we rely on the district court's opinion when it doesn't cite to any of the experts in any substantive detail. And let me add to that. When you yourself have suggested alternative reasons or explanations for these high rates, doesn't that make the expert opinion even more important, more critical? I don't think so, and I'll tell you why. Number one, and Judge Schwartz actually commented on this in the earlier exchange, with regard to Marcus v. BMW. Marcus was an ascertainability case. You're right, Judge Smith. But in Marcus, one of the arguments, the class was certified there and then reversed by this court. One of the arguments the defendants raised was precisely this argument about experts. And the defendant said you can't have certified the class district court because you never even looked at my expert. There's nothing in your opinion that ever even addressed my expert. And this court said that's not an error. You don't have to address all the experts. And hydrogen peroxide is what this court relies upon to say. Isn't that really what's at stake here? This court has never said or even implied that you don't have to address any of the experts in a case. We have suggested, have we not, that you're not required to address each and every expert or expert's testimony. You alluded to a quote, which I think you're probably looking at again now, from hydrogen peroxide. And the quotes that I'd like you to focus on from that decision from this court were, one, weighing expert opinions is proper, but that doesn't make it necessary in every case or unlimited in scope. And two, the court also said in its sound discretion, a district court may find it unnecessary to consider certain expert opinion with respect to a cert requirement. So certainly, and I think you've already agreed with me, there's no mandate that experts have to be looked at. Well, then help us with this. We have the district court's opinion. We have the oral argument that took place. Tell us what we could look to from those sources to know with confidence the district court considered the experts, weighed them in some way, ruled them in or ruled them out. So we could identify things. That would be great. I would suggest to you you don't have to do that because what all of the experts said from the appellant side, all three of them, and Mr. Langer said so today, they all sort of came at it from different angles. But what all of their opinions said was that these merchants are all complete shams. That was the conclusion of all of them. The district court, based on evidence before him during a two-day argument and evidentiary hearing, found as a matter of fact they're not all shams. In fact, he made two critical factual findings that they don't even challenge today. One was that Digitel PPG, the one that testified at the class cert hearing, was a legitimate company that sold legitimate products and brought real savings. That's a finding of fact. And incidentally, there's 900,000 transactions in this case. PPG was responsible for 400,000 of them. So nearly half the case the court found as a matter of fact was legitimate and not a sham. Was that conclusion the result of the kind of rigorous analysis that we demanded in hydrogen peroxide? And so how was it? We've got one witness saying that, well, my wife and I, we use our stuff we sell. No, the witness said a lot more than that, and he was cross-examined for over an hour. And the judge had before him, in support of this rigorous analysis, hundreds of pages of briefing, I think 150-plus pages of expert declarations. It had sworn testimony, live testimony at the class certification hearing, and it came up with a 16-page fairly lengthy opinion. So I think it's wrong to suggest the court did a rigorous analysis. I'm sorry? He said a 16-page fairly lengthy opinion. It's kind of hard to squeeze those two together. Fair enough. But on these issues, the judge said, and in his opinion, he specifically designed. It all depends on the type size, too. It's seven pages in mine. Fair enough. But what he did say in that opinion, among other things, with regard to this particular issue on PPG, is that the man testified. We had documentary evidence supported ahead of time. We had a declaration that Mr. Giorgione, the principal, had supported to the court ahead of time. As I say, he was cross-examined vigorously. And he didn't just say, I had a relative that got braces. He talked about the fact that he has usage reports from people that get the benefits of this product over time. So are you saying that because the plaintiffs embraced a common sham theory and evidence was adduced to show there was no complete sham, and evidence was adduced that there was no complete sham, therefore the district court never had to reach the experts? That's exactly what I'm saying. If the experts are just saying these are all complete shams, and the court found as a matter of fact that they are not all complete shams, why does it need to now go through each of the experts and say why they're not complete shams when the evidence shows that they're not? So from your point of view, you're saying that the factual predicate upon which the experts relied was disproven? It becomes of no consequence. Once he made a factual finding that even the appellant doesn't allege was an abuse of discretion, that factual finding controls. And incidentally, there's another thing the court said, and I agree with my colleague Mr. Becker, words do matter. The court also said, as a finding of fact here, in addition to PPG being a legitimate company, it found that it was, quote, likely that the other merchants would have similar evidence of legitimacy, too. That's a finding of fact the court made, too. We're not just talking about PPG. That is the kind of existential lead that boggles my mind. You've got a suit that involves ten defendants. Defendant A comes forth with proof that it's not a complete sham, and so you say, well, look, if A is not a complete sham, chances are these other nine folks are not complete shams either. How many understand the logic of that? I think it's easy to understand when you consider the rigorous analysis that was done. As I say, there were hundreds and hundreds of pages put before the court in a two-day hearing and live testimony. Among what was submitted to the court wasn't just PPG. Let's talk about NHS, the company that Mr. Langer isolated in his remarks. NHS, there's evidence in the record that one of the other processors after Zions that was considering doing business with NHS, they bought the card to see if it worked appropriately before they decided to do business with them. They bought the card. It had prescription discounts as one of the benefits associated with it. He went to CVS to get a prescription filled, and he got the discount that it was supposed to give to him. So there's evidence of legitimacy right there. How much did he pay for that? I presume he paid what everybody paid, and I think Mr. Langer was right. It was a couple hundred dollars plus a subscription fee thereafter. That's not in the record. He wasn't asked that question in his deposition, but I presume he paid what everyone else paid. But that's just another piece of legitimacy. There's much, much more. For example, PPG testifying, and there's evidence of this among all of the merchants, that they had contracts with reputable third-party providers like AIG, Provident Life Insurance, MasterCard, Visa. Mr. Langer can come up here and tell you these cards were all worthless and they had no value, but he has no evidence that that's actually the case because he never took a single deposition from any of these merchants. He never looked at a single document that he had requested directed to any of these merchants. There were no interrogatories, no discovery at all. Instead, he comes up here with an argument that they all must have been a complete sham. He has no evidence to support it, and what's critical here, as you said, Judge Smith, to get back to the legal issues, not the factual issues, what's critical here is the burden was on the appellant at the class certification stage to prove that these companies are complete shams because, after all, that's the argument that he's advanced as to why the Rule 23 requirements have been satisfied. No, he doesn't have that burden. He has the burden of showing by a preponderance of the evidence that there's a basis to certify a class for which there is evidence that there may be complete sham. But he has said, he has said the reason I, and this was in his You do seem to have conflated the burden of proof between, at the time of certification, with the burden of proof eventually of the merits. No, he has to prove, and this is an important question, the supplemental briefing that the court asked for as to how this case gets around Life USA and Johnston v. HBO where varied oral misrepresentations can't be certified, which even the appellant acknowledges is what happened here. These are all mostly varied, nonstandard oral misrepresentations, just like the precedent in Johnston and Life USA. So he has to, he said, you get around having to delve into all of this morass of individual inquiries because they're all complete shams, therefore common issues predominate, the individual issues aren't of a concern because they're all complete shams. That's why 23b3 has been satisfied. That's his theory, and by choosing to advance that theory to say this is why Rule 23 is satisfied, he has put himself to the burden of having to prove that at the class certification stage. There's basically two tenets of class action jurisprudence here that are both well accepted that intersect on this very point. Number one, class certification, you have to meet the requirements of Rule 23 at class certification. That's pretty unremarkable. Number two, and this was held by this court in all of the cases we've been discussing today, hydrogen peroxide, Marcus v. BMW, and the Supreme Court more recently in Dukes and in Comcast v. Barron. The court said that when determining whether or not the Rule 23 requirements have been met, if that requires delving into the merits of the case, you must do so. It used to be prior to the 2003 amendments to the class rules. That was the old confusion over Eisen, whether or not you could look ahead. And hydrogen peroxide at length. We know that's not the case. Right. Then-Chief Judge Sirica said specifically, look at the 2003 amendments. This was a sea change in class action law. Now you have to dig into the merits if you need to look at the merits to determine class cert. So, Judge Smith, to your question, can he save all of this proof until later at trial? Absolutely not. That precedent all says if you're saying these merits matter in order to get over the Rule 23 hurdles as part of the rigorous analysis, then you have to prove it now at class certification. He doesn't get another chance at trial. He would have to prove it at both stages. Here to say Rule 23's been satisfied, and then at trial he'd have to prove it again to the jury. But Judge, I disagree with the class sham theory as a matter of theory. But if he could show that these entities were all complete shams, that addresses the commonality issues and all the issues built into 23A2, he gets past that if he can show that these are complete shams. If he could show, based on a preponderance of the evidence at the class certification stage, I'd suggest that's correct. But he hasn't found, as a matter of fact, the court has held he hasn't been able to show that here. One way of showing that is the expert evidence. But the experts, just like Mr. Langer and the team representing the appellant, the experts never spoke to anybody at these merchants. They didn't have anything before them other than the same presumptions that the plaintiff wants you to make here. Couldn't they reach that conclusion from the incredible return rates on these transactions? Well, I'm glad you came back to that because that was one of the many questions I didn't get a chance to respond to earlier. Return rates here, there are 68 of them. It's different reasons for a return code. Let's start with this understanding. This case is not about return rates. The putative class, by definition, is not about people that sought or received an ACH return. Let's say there's 30% returns for a merchant. This case is about the 70% that never sought one and never got one. We know nothing about that 70%. And the Sixth Circuit Court of Appeals held on the identical theory, because it was brought by the same counsel in the Johnson v. U.S. National Bank case, that you can't draw inferences of a RICO violation based on red flags or high return rates for fraudulent telemarketing. Wasn't that case decided at the motion to dismiss case? It was. But the Court of Appeals said that you can't draw these inferences that they want you to draw. But isn't that return on the right? What if the return rate were 100%? Would that statement still be true? No, because you don't know why the return rate was 100%. So as I said, there are 68 different reasons. Let's look at what the most prevalent ones were in this case. Insufficient funds. Right? If a person purchases a product either through a telemarketer or an Internet merchant, and Mr. Chief Judge, I see my time has expired. Go ahead. Again, that goes back to my wandering into statistics. I would assume that the rate of return for these nine or eight entities for insufficient funds would be no less and no greater than the universe of telemarketers who deal with the same clientele, maybe different clientele. That return rate is going to be the same across the universe. When you get to a situation where the return rate jumps off the charts, we seem to me that there's something abnormal or irregular about what's going on there that would make that number so much higher than the universe of people that it's a part of. There is no question that every witness in this case has agreed that return rates don't prove anything. They're a starting point, as you say, to look into this and see why the rates are high. I asked you hypothetically if the return rate were 100 percent, would that be sufficient to prove completion? Maybe I misunderstood that. In fact, you said it would. I did say it would not because you don't know why it's 100 percent. Let's say it's 100 percent because the people that purchased that product didn't have the money to cover the product. That's not fraud. Let's say there was buyer's remorse, which is common in telemarketing world and the Internet merchant world where somebody buys a product, and then they change their mind, and they call up two weeks later and say, I never ordered this product. Why would it be so much greater with these entities than with all the other hundreds, maybe hundreds of thousands of entities that are out there? Why would it be so much greater here? Because they're telemarketers and Internet merchants where people very often purchase things they either don't have the money to pay for or they change their mind. But it would be the same, wouldn't it? Wouldn't that universe be the same? No, not with these types of merchants. But doesn't the expert testimony state exactly that or opine exactly that, that excessively high rates of returns are, in the case of Professor Boss, clear indications of fraud? That's what she says. I turn it to you. Well, yes. All the more reason the expert opinion is important. If I understood you correctly a few moments ago, you seem to be suggesting, and please correct me if I'm drawing an incorrect conclusion here, that an expert cannot assume certain factual predicates from which that expert then opines. You had indicated about the lack of depositions, and we don't know the reasons for all of which seems to suggest the total opposite of Eisen. You want the entire case proven at the time of certification, and that's not what's required under peroxide either. Well, I agree that's not what's required under peroxide. What I'm suggesting is… So can an expert assume the factual predicates or assume certain factual predicates, such as those facts would not have to be shown, that it would be enough to have one expert or four say that this high rate is a clear indication of fraud? And the FDIC also. I'm sorry? And doesn't the FDIC say the same thing, that high return rates are the plainest, not a hallmark of mass marketing fraud, but the plainest hallmark of mass marketing fraud? It's clearly an indicator and a weighty one. I'm not suggesting otherwise. And in fact, one fact that gets lost in all of the arguments here… And with the preponderance of the evidence standard, can't that be enough? But you're missing a central focus of what the point of those experts was. If Yuki would tell you, that's not unusual in my case. Well, but those experts are saying you can presume fraud, right, based on the high return rates. You can presume fraud. But remember, the theory that the appellant chose to advance here for class certification is not that there was some fraud or maybe even a lot of fraud. They necessarily have to have complete shams. Every fraud in every case. The man who said he used the NHS card and it worked appropriately is sitting here, and Mr. Reyes is sitting here saying it was a fraud. Clear indications of fraud sounds like a pretty strong opinion to me. Well, look at the Sixth Circuit Court of Appeals. They say you can't make such an inference based on red flags, which were high return rates there too. How do you know that the high return rates weren't because people had buyer's remorse or weren't because there was a technical error in the original? But I didn't even have my statistical question. But didn't even Mr. Geisler say that the high return rates were an indicator, a red flag, but not proof in and of itself? In fact, he used the phrase, it's a starting point, not an end point. Remember, he has to prove the plaintiff does. And the district court quoted that, if I recall. And incidentally, we agree with that. That is the starting point. But that doesn't prove that these companies are complete shams. And you can't reverse the holding of the trial court who found, as a matter of fact, the companies were not all complete shams. Half the transactions were from a legitimate company, and others were likely legitimate too based on abundant evidence of legitimacy put into the record. Help me with that. Abundance evidence of legitimacy. We've got the guy whose wife is buying his product, and we've got the drug prescription discount card. Help me with the abundance evidence statement. Sure. There's two ways to address that. I'll do it most directly first. The guy who's talking about the relative, right, he also testified that he spends $1.4 million annually to provide the benefits that his card brings with it. It's not just a debit card. It's a debit card with all kinds of commensurate benefits. He spends $1.4 million to provide the benefits with contracts that he has with vendors like MasterCard, Protective Insurance, Roadside America. He said there's usage reports that he would get monthly that show all of the people that use these different benefits every month, like the roadside assistants, so that they could gauge how much to charge him to provide those benefits. He said multiple anecdotes of people that got braces through the benefits, like his relative. I think it was the daughter. He talked about people that used the nurse hotline. And there was lots of other evidence he gave, too. And that's just the one company. Let's talk about some of the others. There's declarations in the record here at Joint Appendix 3801 from him and at 3805 from another man named Tasuji, who talked about his company and how his company worked and how there's evidence of legitimacy there, too. None of these are talked about, I suggest to you, because appellant doesn't want, as you suggested, Mr. Chief Judge, as a matter of strategy, he doesn't want anyone to look at these merchants because they might just find evidence of legitimacy he needs. It necessarily depends, his theory does, on every transaction, every one, being a complete sham. And I would turn you to one other thing on abundant evidence of legitimacy. Joint Appendix pages 2718 to 2721 are the answers to the request for admissions in this case that we served. Now, you'll see there's other merchants referenced there because at the time there were other merchants at issue, but among them are the ten here. The request for admission specifically asked, does this merchant, for each of the ten, sell a legitimate product? And the answer for every one of them was, denied, we don't admit that they sell a legitimate product. And then they went on to explain why. They said it's not legitimate, in our view, if the price paid doesn't bear a reasonable relationship to the value. So they didn't say no products were received. They didn't say no benefits came with the products. They said if the price is too high, it's a sham. Two years ago, my wife and I bought a minivan. It turned out to be a lemon. I paid $40,000. I feel that the price was way higher than the reasonable value of that car. I don't believe that Toyota is a sham company. And I don't believe I was defrauded. I went and bought a Honda. But nonetheless, my point is their own strategy is disclosed in those requests for admissions, where they say they're all shams because the prices were too high. That's not fraud, Your Honors. There's not a person in this room that hasn't paid more than what they thought they had to for a particular product. You can't draw the lead that as a result of a price being too high. That's mere market economics, and people come to an agreement over price. Well, but here again, the whole theory to say Rule 23's requirements have been satisfied necessarily depends on every transaction being a sham. And you found something else you wanted because you let Mr. Lindgren. Help me with a practical result. It would be quite possible that if you're right here, what would come out of this would be kind of the Google map to telemarketers in terms of how to commit fraud. That if a company were to set up some kind of telemarketing enterprise, 5% of its business is, quote, legitimate, close quote. And the other 95% is really there just to hose down the people that it calls, get their account numbers, do identity theft. But it's got 5% of its business that it is really selling, and even at reasonable value. How would a class action be appropriate? Because if the telemarketer is big enough, you could never, and if there are enough people involved in this enterprise, not in the legal sense, one could never, ever get past Rule 23 commonality requirements to bring in class action, which would be the only real mechanism for getting some kind of recovery for the people who are hosed down. How do we get around that practical problem with which you're arguing? Well, there's two reasons why it's not a problem here. Number one is this Court has identified this precise argument any number of times. In Newton v. Merrill Lynch, the Court specifically addressed the same argument and said how can we help people if there's no other remedy available to them. And this Court said then that that's not our concern here if they haven't met commonality and predominance. You can't trump those factors and say they're ignored because of what you're addressing. But in Newton v. Merrill Lynch, there was a case where you really had kind of the format as single representation, single product. You're right, but do you know what Newton relied upon to make that very conclusion I just relied to you? A case I'm sure you're familiar with, In Re. Life USA, a case with varied oral misrepresentations that the Court held cannot be certified as a class. For the very same proposition, it cited that case to say we can't get over that. Maybe In Re. Life USA and Johnson put language on it that we need to get control of because, again, it says to the telemarketers, look, there's a very strict here. Make sure we don't do anything that is so uniform that it can be looked at and seen as a script. But basically the people who are working in the boardrooms who use Mr. Langer's phrase know basically what they have to do. It's up to their own judgment as to how to do it, how to get the correct information or how to sell what may be a useless product. As long as they're not reading from a script, then they can fall back on Life USA and Johnson and their immune from class lawsuit. How do we avoid that kind of result? You say we have to worry about it here, but our opinion, if it's presidential and if you were to win, is going to be applied in other cases just as Life USA is being applied here. That's correct.  If in the future there's a situation where somebody says I'm going to have 5% legitimacy and 95% fraud, if that happens in the future and the court should find after doing the rigorous analysis there's no uniform evidence to go across the whole class and there's no individual issues that don't predominate over the common ones, then class certification just wouldn't be appropriate. And as unfortunate as that may be, if it's the only remedy available, it doesn't meet the other requirements that this court has long held are required. You don't trump them for superiority. And I think it's important also to note the very point that you're concerned about. You would satisfy superiority because that would be the only way. Well, let's say you've got 30% are legit and 70% are fraud. How do you know which pew to the plaintiff is in and which one is out? Which one's like Mr. Reyes or which one was like the guy Mr. Hughes who bought the NHS product and it worked? Now we're talking manageability. You have to discuss individual inquiries to determine who was defrauded and who was not, who was damaged and who was not. In this case, tens of thousands of people already got their money back and they had no injury at all through either direct merchant refunds or settlements from the FTC class act. But that's the damages issue. When it gets past certification, that could easily be dealt with. No, because it's not a matter of calculating the amount of damages, which this court has long held is not something to prevent class certification. What I'm talking about is the fact of damages. Comcast v. Barron talked about damages having to be proven on a class-wide basis. I'm speaking of the fact of damages. Tens of thousands of people in this putative class already have been made whole and we have no way to know who they are. No way to know. So if you certify a class because you're concerned about 5% that may have been defrauded, you're now going to reward the pew to the plaintiff with recoveries that tens of thousands of them have already received. This is why I say who's in and who's out is a manageability problem. Separate mini-trials for each transaction. Who was damaged and who was not, likewise, separate trials. And by the way, this is a RICO case, Mr. Chief Judge. It's not a case of just alleging fraud against one of the merchants. It's a very complicated RICO theory saying the Zions defendants knew and participated in this conduct. So they would have to prove that the Zions bank defendants, by looking at every one of the ten different relationships it had with these merchants, every one of them to determine if and when Zions ever knew that there was any fraud. Because if they can determine that there was a point when that was the case, that point in time, any transactions that occurred prior to that can't be part of this RICO case. Only transactions that occurred thereafter once the defendants were participants in this grand RICO conspiracy. So the trial court would have to see who's in and who's out. It would have to see who got their money back and who didn't. And it would have to see when is this point in time, if ever, for any of these ten merchants. And it can only do that through ten separate trials with regard to each merchant. It would be epic manageability problems. In the future, if there's 5% legit and 95% illegit, those same problems would still result. You still don't know with any putative plaintiffs who's been injured at all. Let me say your argument and I think, Mr. Langham, you have two minutes. Thank you, Your Honor. Okay, thank you. Your Honors were asking me about, well, didn't the district court just decide one expert over the other? On the issue of fraud, there were no contrary experts. It was just our experts. Okay. And second, in answering Judge Schwartz's question, these experts had before them the entire scheme, what was being sold and how it was being sold. In what form? How did they have it? The bank had records. We had gotten all of the records from all of the FTC proceedings. So the court records, things submitted by the government. Correct. Did it include business records from the entities that were being investigated by the FTC? To a substantial extent. Okay. But it had also from the bank as well. And that was one of the things we raised in our brief, that the court clearly didn't look at the experts because he could not have looked at the experts and concluded that we relied solely on return rates because two of the experts, Dr. Meyer and Ms. Blake, went through each scheme to show how similar they all were to each other and how they studied exactly what the scheme did. You mentioned in your brief that the district court could have certified the subclass. Was any request made of a subclass certification? Yes, there was. Wasn't that only like an apply brief and a footnote? To be honest, I don't know exactly where it was, but it was done. It may have been. Does that matter? I really don't know off the top of my head, frankly. But it was a request. If you could do a 28-J because your lights are almost going to come on and you want to be a little more disciplined on the red light at play stage, If you could just send us a 28-J letter letting us know whether that request was made. Okay. Second, I just want to say that Judge Smith is exactly right. The court held us to the standard that was being espoused by my learned colleague, that we had to prove our case at the class stage. We had presented abundant proof from which a jury could have concluded they were complete champs. And I ask your honors to focus again on the concluding section of Marcus, because there the court talks about what it describes how a class cannot be denied if there is some small group that falls outside. The Zaccarello case that the court talks about is exactly like USA's facts. The light is on. I don't want you to cut me off too much, but I wanted to start out. Just a broad sentence. The Zaccarello case that they discussed there is exactly like USA's facts. Thank you, Your Honor. A nice try. Very intricate and complicated and very interesting and also a very important case. We thank counsel for having me and we'll take them at under advisement. Thank you.